Leo Fox, Esq.
630 Third Avenue
18th Floor
New York, New York 10017
(212) 867-9595

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In Re:                                                   Case No. 16-11644 (SHL)

       261 E. 78 LOFTS LLC,                          Chapter 11

               Debtor.
-------------------------------------------------------X

## OBJECTION TO DISCLOSURE STATEMENT

261 Lofts Manager LLC and Henry Miller, by their attorney, Leo Fox, for their objection to the adequacy of the disclosure contained in the Debtor's Disclosure Statement (ECF #16), in connection with the Debtor's Chapter 11 Plan of Reorganization (ECF #15), respectfully represents.

## PRELIMINARY STATEMENT

1.      The Court is confronted with the efforts by Mr. Moncho, the Debtor's purported principal, to confirm a reorganization plan involving the same real property located at 261 East 78th Street. As a result of the prior confirmation of the Plan, Mr. Moncho, an acknowledged minority interest holder of the Debtor, filed this petition to stay the course of a State Court litigation which would have determined the rights of the interest holders in the Debtor and to determine whether or not to release an escrow filed in the New York State Supreme Court which would have made Mr. Moncho the majority owner. Undoubtedly, Mr. Moncho, seeing the writing on the wall, determined to file this case to avoid that result.

2.      A reading of this Plan reveals that once again the Debtor challenges the creditors which assisted the Debtor in connection with a prior bankruptcy and threatens litigation as a

cudgel to compel these creditors to comply with the Debtors wishes.

3.     Thus, this Plan is a continuation of the Debtor's unwillingness to be clear and forthright and candid with its creditors and to require the creditors to accept less than they are entitled to in order to enrich Mr. Moncho's alleged equity interest.  Creditors are being asked to subordinate to the equity holder or face litigation, standing the term "absolute priority" on its head.

4.     It has been stated that "Disclosure is a fundamental component of the bankruptcy process." *In re Midwest Props of Shawano, LLC*, 442 B.R. 278, 286 (Bankr. D. Del. 2010).  The disclosure statement is necessary to provide creditors with sufficient information to enable them to cast an informed vote on the plan.  *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d. Cir. 1994) ("Of prime importance in the reorganization process is the principle of disclosure.").  There are at least 19 factors to be disclosed under *In Re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  Few of these factors are disclosed, and none accurately, in the Debtor's Disclosure Statement.

## BACKGROUND

5.     On December 6, 201, 261 East 78th Realty Corporation filed its petition under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court of the Southern District of New York (Case No. 11-15624 (REG)).[1]

6.     Three (3) years later, as noted in Mr. Moncho's affidavit verified January 27, 2014 in support of the confirmation of the Second Amended Plan (Exhibit A) the Debtor submitted a Plan calling for in exchange for transfer of the ownership to Mr. Henry Miller's entity 261 East 78 Lofts LLC, Sam Sprei, on behalf of Henry Miller, to fund all the distributions

---

[1] It is not at all clear how the case herein as a repetitive filing did not go back to Judge Gerber.  Undoubtedly, this is due to the failure of the Debtor to disclose on its Petition the facts of the prior filing.

to be made under the Plan consisting of $10,700,000 on account of the first mortgage held by

MB Financial Bank, $650,000 for administrative expenses, $1,325,000 to Hermes in

consideration of the assignment of his claim to the Plan funder ("Henry Miller's entity 261 East

78 Lofts LLC") and $450,000 distribution fund payable to the unsecured creditors.

7.      Mr. Moncho notes that Mr. Sprei, on behalf of Mr. Miller, had arranged for "all of

the funding and/or financing necessary to consummate the plan and all distributions required

thereunder" and states

> He is gratuitously granting me at 37.5% equity interest in the Plan Funder
> as an accommodation to me, as both Mr. Sprei and I believe Mr. Sprei will
> need my continued experience, know how, understanding and involvement
> in management and development of the Property so that he may someday
> see a return on his significant investment under the Plan totaling no less
> than now $13,625,000.

8.      Mr. Moncho continued to affirm that he would continue to serve as the sole

officer of the Debtor for which he would receive no compensation (Affidavit – Page 11 – 23(g).

Contrary to those sworn statements, Mr. Moncho took no only a management fee of 1.5% of

gross revenues of the Debtor.

9.      Under the terms of the Operating Agreement, Mr. Moncho was obligated to

complete the leasing of the premises, as part of his obligations to manage and develop the

property (Moncho Affidavit – Paragraph 5).

10.     The Debtor and Mr. Moncho claimed that they were defrauded into accepting a

"hard money" loan.    The MB Loan deadline of 120 days after Confirmation was quickly

approaching.    Mr. Miller had obtained a traditional bank loan including a commitment from

Signature Bank (Exhibit B) but the income was not present to sustain and substantiate such a

loan and the reason that the income was not present was that Mr. Moncho failed to abide by his

obligations as the sole officer and under the terms of the Operating Agreement to lease the space

out. As a result, that loan could never be consummated.

11.    On March 25, 2014, the Madison Loan closed. At the closing of the transactions, Mr. Miller arranged for the advance of sufficient funds consisting of the amounts set forth in the Moncho Affidavit of $10,700,000 on account of the Debtor's obligations to MB under the Settlement Agreement, $650,000 for administrative expenses and professional fees, $1,325,000 to Hermes on accounts of its Class 3 secured claim, and $450,000 paid to the allowed Class 4 unsecured creditors. (See Moncho Affidavit – Paragraph 4). By application dated March 14, 2014 (Exhibit C), the Debtor requested entry of a final decree, stating that substantial consummation of the Plan had occurred and that on March 11, 2014 complete distributions had been made to the creditors under the Plan (Application - Paragraph 5-6).

12.    Mr. Miller had complied with all of the obligations he was required to render. But Mr. Moncho had made it increasingly difficult to continue as participants in the Debtor. Mr. Miller was entitled and authorized to do whatever he wished to do and he determined to transfer a portion of his interest in his wholly owned entity to Mr. Dong.

13.    Subsequently and during the time period that Mr. Moncho was the sole officer and in charge of operations, the Madison mortgagee commenced foreclosure proceedings based upon Mr. Moncho's failure to make mortgage payments. Although Mr. Moncho claims that the default was because of Mr. Miller and Mr. Sprei, the fact of the matter is that there were insufficient funds available due to Mr. Moncho and his family taking over $517,000 during the period May 1, 2014 through December 8, 2015 as evidenced by the attached schedule (Exhibit D). This amount equaled many months of mortgage payments which would have enabled the Debtor to continue without being placed in default.

14.    On or about September 30, 2015, an Escrow Agreement between Miller and the

lawfirm of Delbello Donnellan Weingarten Wise & Wiederkehr, LLP, was entered into pursuant to which, among other things, an assignment of the membership interests of 261 E. 78th Street Lofts LLC and an assignment of membership interest dated December 28, 2014 would be delivered to Moncho in the event certain conditions described n the Escrow Agreement had not been satisfied.

15.    Instead of proceeding with litigation, Mr. Moncho filed a Chapter 11 case clearly at time when it appears that it is undisputed and is acknowledged in the Disclosure Statement he was holding no more than 37.5% of the equity interests of the Debtor (Disclosure Statement – Page 6).[2] Thus, it appears to be the case that there was never corporate authority for the filing of this Chapter 11 case and that this entire case was a means forum shopping to avoid a disposition by the New York State Supreme Court having the jurisdiction to rule on the issues of equity ownership in this Debtor.

16.    At this point, the Objectant has no objection to a fair and fully disclosed sale of the Debtor's real property, with the proceeds to be maintained by an acceptable fiduciary which is not the Debtor subject to disposition of the rights of the creditors, and the rights of the equity holders in accordance with the New York State Supreme Court litigation.  It is requested that the Court extend these protections to an open disclosure as to all consideration for the sale of the Debtor's real property and any other assets of the Debtor being disclosed in the Disclosure Statement, the terms of such consideration and whether such consideration constitutes a full and fair value.

17.    Mr. Moncho, in fact, has not disclosed, and concealed the terms of the sale.  As

---

[2] The Bar Date Notice in this case (Docket No. 22) provides that persons holding an equity interest with respect to the ownership in the Debtor need not file a Proof of Claim (Notice – Page 4), and solely to the extent that it may be ultimately determined that the Objectant should file a claim, the objection herein should be deemed to constitute an informal claim.

noted in the objection filed by secured creditor, Joseph Zelik, (Docket No. 28), the auctioneer is
to sell the property owned by the Debtor but not the unused development rights, i.e., air rights,
but not specifying the amount or the value of such unused development rights (Objection –
Paragraphs 3 and 4). That critical element is not disclosed anywhere in the Plan or Disclosure
Statement. The Objectant, however, obtained a zoning report dated October 9, 2016 (Exhibit E),
reflecting that there exists 7,871.78 square feet of air rights (Report Page 5) of the total
22,591.55 square feet of total permissible development rights which is not being sold as part of
the estimated $20,000,000 purchase price. Since the Existing Floor Area of 14,719.80 square
feet being sold equals the potential $20,000,000 purchase price, there is a total value of $1,358
per square foot for the property ($20,000,000 divided by 14,719 square feet). Consequently, the
over 7,000 square feet of air rights has substantial value which has not been disclosed.

18.    The Objectant, as the equity holder of approximately 2/3 of the equity of the
Debtor, has consequently been harmed by this concealment raising questions as to whether the
Debtor herein has properly rendered its duties under Section 1107 of the Bankruptcy Code or
whether in fact a Chapter 11 Trustee should be more appropriately in charge of the
responsibilities to the creditors to assure that the creditors and equity holders receive all that such
equity holders are entitled to under this Plan.

19.    It is clear that this Debtor should not be trusted based on the repeated
misrepresentations of Debtor's principal, Mr. Moncho, made in the prior Chapter 11 case, in this
Chapter 11 case and the actions by the Debtor's principal so far. This Court should appoint a
Chapter 11 Trustee to supervise the liquidation and sale of the real property to assure that
creditors and equity holders are treated fairly and equitably and subject to the whims of the
Debtor's principal who has shown himself to be as incapable of conducting himself as Debtor's

6

principal and officer pursuant to Section 1107 of the Bankruptcy Code.

*WHEREFORE*, it is respectfully requested that the Court deny the Disclosure Statement in its present form, and alternatively modify the Disclosure Statement to meet the requirements of full disclosure required by Section 1125 of the Bankruptcy Code, arrange for the appointment of a Chapter 11 Trustee to undertake the sale of the real property, and grant such other and further relief as is proper.

Dated: New York, New York
October 28, 2016

/s/ Leo Fox
Leo Fox, Esq.
630 Third Avenue
18th Floor
New York, New York 10017
(212) 867-9595
leofox1947@aol.com

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

*Hearing Date: 1/28/14*
*Hearing Time: 9:45 A.M.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

261 EAST 78 REALTY CORPORATION,

                     Debtor.

Chapter 11

Case No.: 11-15624(REG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF LEE MONCHO IN SUPPORT OF CONFIRMATION OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR

STATE OF NEW YORK    )
                           ) ss:
COUNTY OF NEW YORK  )

Lee Moncho, being duly sworn, hereby deposes and says:

1.    I am the sole officer and shareholder 261 East 78 Realty Corporation, the above-captioned debtor and debtor in possession (the "Debtor").[1]  I am familiar with the facts and circumstances hereafter set forth.

2.    I make this Affidavit in support of confirmation of the Second Amended Plan of Reorganization proposed by the Debtor (as may be amended and/or modified, the "Plan") [*ECF Docket No. 200*] dated as of January 17, 2014, and, if called to the witness stand, I would further testify under oath as follows:

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Plan.  Any capitalized term used in the Plan or in this Confirmation Affidavit that is not defined in the Plan or in this Confirmation Affidavit, but that is used in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), or in the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.



## PRELIMINARY STATEMENT

3.      As a result of a global resolution of certain disputes between (a) the Debtor and

MB Financial Bank, N.A. ("MB"), as set forth in the Settlement Agreement dated as of October

31, 2013 (the "Settlement Agreement"), a copy of which is annexed to the Plan as Exhibit "A"

and is specifically incorporated by reference and made a part thereof, and (b) a settlement with

Hermes Capital, LLC ("Hermes"), which settlement was put on the record at a telephonic

conference held before the Court on January 16, 2014 (the "Hermes Settlement"), the Debtor

has proposed a modified plan of reorganization that will enable the Debtor to maximize

recoveries to its creditors and resolve the underlying litigations with MB and Hermes,

respectively.

4.      The Plan provides that 261 East 78 Lofts, LLC (the "Plan Funder"), a new entity

to be formed by Sam Sprei and Lee Moncho, will fund all distributions to be made thereunder,

including $10.7 million on account of the Debtor's obligations to MB under the Settlement

Agreement, $650,000 for all administrative expenses and professional fees incurred in

connection with the Chapter 11 case (as may be allowed by the Bankruptcy Court) and

consummation of the Plan, $1,325,000 to Hermes in consideration of its transfer and assignment

of its Allowed Class 3 Secured Claim to the Plan Funder, and a $450,000 distribution fund for

Allowed Class 4 Unsecured creditors of the Debtor, which fund shall solely be for distribution to

the Class 4 Unsecured Creditors (other than MB and Hermes and/or the Plan Funder as assignee

of Hermes).

5.      Specifically, Mr. Sprei has arranged for all of the funding and/or financing

necessary to consummate the Plan and all distributions required thereunder. He is gratuitously

granting me a 37.5% equity interest in the Plan Funder as an accommodation to me, as both Mr.

2

Sprei and I believe Mr. Sprei will need my continued experience, know how, understanding and involvement in management and development of the Property so that he may someday see a return on his significant investment under the Plan totaling no less than now $13,625,000.

6.      My equity Interests are being canceled under the Plan. I have been advised by counsel that there is nothing illegal, improper or in bad faith by Mr. Sprei giving up some of his interests in the Plan Funder to me or for that matter anyone he so chooses. Such interests are his to do as he chooses with and it is of no consequence to the Plan or to the detriment of any parties in interest in the Chapter 11 Case.

7.      There are no side deals or undisclosed terms with respect to, inter alia, the modified Plan or the First Amended Plan Term Sheet annexed to the Plan. To the contrary, the Debtor fully disclosed each and every term of the modified Plan and First Amended Plan Term Sheet to all of its creditors.

8.      The Plan was not only made in good faith but complies with all Bankruptcy laws, does not in any way violate the "Absolute Priority Rule", as explained to me by my attorneys, and results in a great benefit to the unsecured creditors of the estate.

9.      Furthermore, MB and Hermes (and/or the Plan Funder as its assignee) have made a material accommodation to the unsecured creditors under the Plan by (a) waiving MB's right to distribution on its almost $7 million unsecured claim granted under the Settlement Agreement and (b) Hermes and/or the Plan Funder as assignee waiving any potential Class 4 Unsecured deficiency Claims as well. This will result in the Class 4 Unsecured Creditors receiving an approximate 19.3% distribution. Absent such contributions, or "gifts", the unsecured creditors, whose claims (other than MB and Hermes) total approximately $2.3 million, would receive a drastically reduced distribution, if any at all, under the Plan or zero under a liquidation scenario.

3

Absent the funding being provided by Mr. Sprei, there would be no cash or other assets of the Debtor to make distributions to creditors other than MB.

10.     Under the Plan, on the Effective Date, (i) on account of Mr. Sprei's funding of the Plan, the Debtor shall transfer and convey to the Plan Funder right, title and interest to the Property free and clear of all Claims, Liens, charges, interests and encumbrances without recourse to the Debtor; and (ii) Mr. Sprei shall fund the Plan to the extent required to make all payments and/or distributions under the Plan.

11.     Notwithstanding the foregoing, under Section 4.3 of the Plan, if in the event that the Debtor (or the Plan Funder on its behalf) fails to pay MB $10,700,000.00 in satisfaction of its Allowed Class 2 Secured Claim before the expiration of the 120-Day Deadline, the Debtor shall conduct a public auction of the Property (the "Public Sale") on or before 140 days after the execution of the MB Settlement Agreement with a closing to occur on or before the 150-Day Deadline and the following provisions shall apply:

(a)     Increased Allowed Class 2 Claim and Right to Credit Bid.  Following the 120 Day Deadline and during the Public Sale process, MB's Allowed Class 2 Secured Claim shall increase to $11,000,000 and MB shall have an absolute right to credit bid its Allowed Class 2 Secured Claim up to the amount of $11,000,000.

(b)     Termination of Plan Funder Transaction.  Following the 120-Day Deadline, the Debtor may not terminate the Public Sale by satisfying MB's Allowed Class 2 Secured Claim in cash through a refinancing and a transfer of the Property to the Plan Funder pursuant to Section 4.2 shall not proceed, *provided, however*, that the Plan Funder may participate in the Public Sale by submitting a Qualifying Bid (as defined below).

(c)     Qualifying Bids.  MB's credit bid in the Public Sale shall be subject to higher and

4

better cash bids made by bidders with the financial wherewithal to close by the 150-Day Deadline, provided that any such competing bids are subject to payment of a 10% deposit and a minimum overbid (above $11,000,000) (the "Minimum Overbid") equal to the sum of (A) all outstanding real property taxes due with respect to the Property, if any (B) Allowed General Administrative Expense Claims and Allowed Administrative Professional Fee Claims and (C) all sale closing costs, including any broker's commission, if applicable, such that the net sale proceeds available to pay MB Financial shall be at least $11,000,000 (each a "Qualifying Bid").

(d)    Notice of Public Sale.  The Debtor shall serve notice of the Public Sale and the amount of the Minimum Overbid in the manner required by Bankruptcy Rule 6004(a) no later than fifteen (15) days before the date set by the Debtor as the deadline to submit bids during the Public Sale (the "Bid Deadline").  The Bid Deadline shall be at least 2 business days before the date of the Public Sale.  The Debtor shall otherwise comply with Bankruptcy Rule 6004 in conducting the Public Sale.

(e)    Sale of Property to MB.  In the event that the Debtor is unable to consummate a refinancing and pay MB Financial $10.7 million on or before the 120-Day Deadline or MB Financial does not receive $11 million on or before the 150-Day Deadline from the proceeds of a sale of the Property to a third party that submitted a Qualifying Bid on or before the Bid Deadline, MB Financial shall receive title to the Property, free and clear of all Liens, Claims, encumbrances and interests of any kind pursuant to Sections 363(b), 363(f), 365 and 1146(a) of the Bankruptcy Code, in consideration of its credit bid, on the 150-Day Deadline and MB Financial shall make the MB Plan Contribution as instructed by the Disbursing Agent.  If a Qualified Bid is not received before the Bid Deadline, the Debtor shall be obligated to execute and deliver all documents of assignment and transfer reasonably requested by MB, including,

5

without limitation, those documents set forth in Section 4.2(b) of the Plan, to convey it title to the Property such that a closing can occur on the 150-Day Deadline. In the event that a Qualified Bid is received before the Bid Deadline, but the successful bidder fails to close by the 150-Day Deadline, then the Debtor shall be obligated to promptly proceed with a closing of a sale of the Property to MB (in the same manner as set forth in the preceding sentence) as soon as practicable after the 150-Day Deadline or earlier if the Debtor has prior notice that the successful bidder will not close on the sale by the 150-Day Deadline.

## RECITALS

12.    On November 15, 2013, the Debtor filed a First Amended Plan of Reorganization, and on December 16, 2013, the Debtor filed the Second Amended Disclosure Statement (as may be amended and/or modified, the "Disclosure Statement") [ECF Docket No. 177] with respect to the Plan.

13.    On December 16, 2013, the Court entered an Amended Order (the "Scheduling Order") approving the Disclosure Statement and scheduling a hearing (the "Confirmation Hearing") to consider confirmation of the Plan to be held on January 28, 2014.

14.    On December 20, 2013 as evidenced by the Affidavit of Service duly sworn to on December 20, 2013 [ECF Docket No. 182], the Debtor caused the timely mailing to all known creditors and equity security holders of the Debtor of an information and solicitation package consisting of, (i) the Disclosure Statement and all exhibits thereto, (ii) the Plan (furnished in the Solicitation Package as an exhibit to the Disclosure Statement), (iii) and the Scheduling Order. With respect to those creditors and equity holders with claims or equity interests in a class entitled to vote on the Plan, the Debtor also included ballot forms (the "Ballots").

15.     On January 16, 2014, the Debtor and Hermes placed the terms of the Hermes Settlement, which settlement in specifically incorporated into the Plan, onto the record of the Court.

16.     On January 17, 2014, the Debtor filed the Second Amended Plan of Reorganization ("Plan") with the Court [*ECF Docket No. 200*].

17.     On January 17, 2014, the Court entered an Oder Authorizing Service and Resolicitation of Debtor's Second Amended Plan of Reorganization, Fixing Time for Filing Acceptances or Rejections Thereof and Objections To Confirmation [*ECF Docket No. 201*] (the "Resolicitation Order").

18.     On January 17, 2014, the Debtor timely effectuated service of the Resolicitation Order and modified Plan and accompanying ballot to all creditors and parties in interest and filed an Affidavit of Service to that effect with the Court [ECF Docket No. 202].

19.     On January 27, 2014, the Debtor caused to be filed, in accordance the Certification of Ballots [*ECF Docket No. 203*], certifying the Ballots accepting or rejecting the modified Plan, attesting to and certifying the method and results of the ballot tabulation for the classes of claims and equity security holders voting to accept or reject the Plan (the "Voting Report"). As reflected in the Voting Report, Class 2 (MB Secured Claim), Class 3 (Hermes Secured Claim) and Class 4 (General Unsecured Claims) have each voted to accept the Plan. Class 1 (Other Priority Claims) is unimpaired under the Plan, not entitled to vote and are deemed to accept the Plan.  Class 5 (Equity Interests) will not receive any distribution under the Plan on account of Interests in the Debtor and is deemed to have rejected the Plan.

20.     No party filed an objection to confirmation of the Plan.

7

21.   <u>Summary of Distributions</u>. As more fully described in the Plan and Disclosure Statement, the Plan provides that, subject to Section 4.3 of the Plan and MB's rights and the potential auction sale process thereunder, the Plan Funder, via Mr. Sprei, will fund the Plan under which the following distributions will be made.

(a)   Pursuant to the Plan, holders of (i) Allowed Administrative Claims (other than Allowed Professional Fee Claims), (ii) Allowed Priority Tax Claims, (iii) Allowed Other Unclassified Claims, (iv) Allowed Other Priority Claims and (v) Statutory Fees will be paid in full.

(b)   Pursuant to Section 3.2(c) of the Plan, Hermes shall assign its Class 3 Claim to the Plan Funder upon receipt of $1,325,000 within 2 days of entry of the Confirmation Order.

(c)   Pursuant to the Plan, and subject to Section 4.3 of the Plan, holders of Allowed General Unsecured Claims (other than MB or Hermes and/or the Plan Funder as its assignee) shall receive their pro rata distribution of up to $450,000 payable on the Effective Date (or as soon as practicable thereafter).

(d)   Pursuant to the Plan, holders of Allowed Professional Fee Claims shall receive up to 100% of the unpaid amount of such Allowed Professional Fees Claim in Cash after such Professional Fee Claim becomes an Allowed Professional Fee Claim; provided, however, that if the aggregate net unpaid Allowed Professional Fee Claims exceed $625,000, the holders of Allowed Professional Fee Claims shall share pro rata in the $625,000 Professional Fee distribution fund.

8

(e)     Equity Interests will not receive or retain any property under the Plan on

account of Class 5 Interests.

22.     <u>Third-Party Releases</u>.  The Plan provides for releases of the Debtor, Lee Moncho,

Karen Moncho, the Plan Funder, Sam Sprei, Hermes and its respective shareholders, members,

managers, general partners, limited partners, officers, directors, employees, agents

representatives, attorneys and advisors or consultants (collectively, the "<u>Released Parties</u>").  The

releases of the Released Parties are critical and necessary to the Debtor's reorganization and are

an integral part of the Plan.  The releases of the Released Parties are also being given in

exchange for valuable consideration. The Released Parties are providing all funds with which to

fully fund the distributions required under the Plan.  This funding contribution is obviously

essential to the implementation of the Plan and the releases proposed under the Plan are

necessary to secure such funding.  Accordingly, the Debtor believes that the releases of the

Released Parties provided under the Plan are essential to its implementation and are warranted by

the unique circumstances of the Chapter 11 Case and should be approved.

23.     <u>Plan Compliance with the Applicable Provisions of the Bankruptcy Code (11</u>

<u>U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

a.  <u>Proper Classification of Claims and Interests (11 U.S.C. § 1122, 1123(a)(1))</u>.  In

addition to Administrative Expense Claims (including claims of estate

professionals) and Priority Claims which need not be classified, the Plan

designates five Classes of Claims and Equity Interests.  The Classes were

determined solely on the basis of their respective priorities under the Bankruptcy

Code.  The Other Priority Claims, MB Secured Claim, Hermes Secured Claim,

General Unsecured Claims and Equity Interests were each given their own classification. The Claims or Equity Interests placed in each Class are substantially similar to other Claims or Equity Interests, as the case may be, in such Class. Valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such classification does not unfairly discriminate among holders of Claims or Equity Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

b. <u>Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. The Plan specifies that Class 1 (Other Priority Claims) is not impaired, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

c. <u>Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>. Article III of the Plan designates Classes 2 (MB Secured Claim), 3 (Hermes Secured Claim), 4 (General Unsecured Claims) and 5 (Equity Interests) as impaired and specify the treatment of Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

d. <u>Equal Treatment Within Classes (11 U.S.C. § 1123(a)(4))</u>. The Plan provides for the same treatment by the Plan Proponents for each Claim or Equity Interest in a particular Class unless the holder of a particular Claim or Equity Interest in such Class has agreed to a less favorable treatment of its Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

e. <u>Implementation of Plan (11 U.S.C. § 1123(a)(5))</u>. The Plan provides adequate and proper means for implementation of the Plan, including that, on the Effective

10

Date, (a) the Debtor, subject to Section 4.3 of the Plan shall irrevocably transfer, assign and convey the Property to the Plan Funder pursuant and/or subject to the terms of the Settlement Agreement and the Plan and (b) Mr. Sprei on behalf of the Plan Funder shall fund the Plan, which funds are to be administered by the Disbursing Agent, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP or counsel to the Plan Funder as applicable under the Plan. The Disbursing Agent will be able to make all of the payments required pursuant to the Plan and, therefore, confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Therefore, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

f.  Charter Provisions (11 U.S.C. § 1123(a)(6)).  The Plan does not provide for the charter provisions described in section 1123(a)(6) of the Bankruptcy Code, and thus section 1123(a)(6) is not applicable

g.  Selection of Officers and Directors (11 U.S.C. § 1123(a)(7); § 1129(a)(5)).  The Plan does not provide for the selection of, any officers, directors, or trustees who would serve under the Plan.  Accordingly, section 1123(a)(7) is not applicable. As disclosed in the Disclosure Statement, I will continue to serve as the sole officer of the Debtor, for which I will receive no compensation. Accordingly, the requirement under section 1129(a)(5) of the Bankruptcy Code to disclose the identity and affiliations of any individual proposed to serve, after the confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, and the nature of any compensation for such insider, has been satisfied.  The continuance of my role with the Debtor is consistent with the interests of the creditors and equity

11

security holders and with public policy and, accordingly satisfies section 1129(a)(5) of the Bankruptcy Code.

h. <u>Rule 3016(a) of the Bankruptcy Rules</u>. The Plan is dated and identifies the entity submitting it, thereby satisfying Rule 3016(a) of the Bankruptcy Rules.

24.     <u>Plan Proponent's Compliance with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtor has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code. Specifically:

a. the Debtor is a "person" as defined under section 101(41) of the Bankruptcy Code that has a place of business and property in the United States and, therefore, is a proper debtor under section 109 of the Bankruptcy Code and the Debtor is a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code;

b. the Plan Proponent has complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and

c. the Plan Proponent has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Scheduling Order and the Resolicitation Order in transmitting the Solicitation Package and in soliciting and tabulating votes on the Plan.

25.     <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Plan Proponents has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Chapter 11 Case was filed with the purpose of reorganizing the Debtor, and the Plan, the MB Settlement Agreement, the Hermes Settlement and the documents and other deliverables set forth in the Plan (the "<u>Closing Documents</u>") were the result of arms'-length negotiations and reflect a settlement of the disputed issues between the

Debtor, MB and Hermes as set forth in the Plan, the Disclosure Statement, and the record of the Chapter 11 Case.

26.    <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).</u>  Any payment made or to be made by the Plan Proponent for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

27.    <u>No Rate Changes (11 U.S.C. § 1129(a)(6)).</u>  There are no rates applicable to the Debtor's businesses or otherwise over which any regulatory commission or other governmental authority has, or will have, jurisdiction after confirmation of the Plan, whose approval of such rates is required under section 1129(a)(6) of the Bankruptcy Code.  Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in the Chapter 11 Case.

28.    <u>Best Interests of Creditors Test (11 U.S.C. § 1129(a)(7)).</u>  The Plan provides that each holder of a claim or interest in an impaired class either shall have accepted the Plan or will receive or retain under the Plan on account of such claim or interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.  The Liquidation Analysis contained in the Disclosure Statement reflects that each holder of a claim or interest in an impaired class will receive a distribution on account of such claim or interest that is not less than such holder would receive or retain if the Debtor was liquidated in a chapter 7 bankruptcy case.  Thus, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

29.    <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).</u>  Class 2 (MB Secured Claim), Class 3 (Hermes Secured Claim) and Class 4 (General Unsecured Claims) have each

13

voted to accept the Plan. Class 1 (Other Priority Claims) is unimpaired under the Plan, not

entitled to vote and is deemed to accept the Plan. Class 5 (Equity Interests) will not receive any

distribution under the Plan on account of Equity Interests in the Debtor and is deemed to have

rejected the Plan.

      30.   <u>Treatment of Administrative Expense and Priority Claims (11 U.S.C. §</u>

<u>1129(a)(9))</u>. Section 3.1(a) of the Plan provides that, except to the extent the holder of an

Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative

Claim (which does not include claims for fees and expenses incurred by bankruptcy counsel for

the Debtor) shall be paid in respect of such Allowed Administrative Claim (a) the full amount

thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on

which such Claim becomes and Allowed Administrative Claim, or upon such other terms as may

be agreed upon by the holder of such Allowed Administrative Claim, or (b) such lesser amount

as the holder of such Allowed Administrative Claim, the Debtor and the Secured Lender might

otherwise agree; provided, however, that all Administrative Claims incurred in the ordinary

course of the Debtor's business during the Chapter 11 Case shall be paid in the ordinary course

of the Debtor's business. Notwithstanding the foregoing, the Statutory Fees shall be paid in

Cash as soon as practicable after the Effective Date. Section 3.1(d) of the Plan provides that,

except as provided therein, each holder of an Allowed Priority Tax Claim shall be paid in respect

of such Allowed Claim (a) the full amount thereof, without post-petition Date interest or penalty,

in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which

such Claim becomes an Allowed Priority Tax Claim; or (b) upon such other terms as may be

agreed upon by the holder of such Allowed Claim and the Secured Lender. Section 3.1(b) of the

Plan provides that each holder of an Allowed Professional Fee Claim shall receive up to 100% of

the net unpaid amount of such Allowed Professional Fee Claim in Cash after such Professional Fee Claim becomes an Allowed Professional Fee Claim provided, however, that in the event that aggregate net unpaid Professional Fee Claims exceed $625,000, then the holders of net unpaid Allowed Professional Fee Claims will share pro rata in the $625,000 Professional Fee distribution fund. Each Professional person has agreed to such impaired treatment. Section 4.1 of the Plan provides that each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Other Priority Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Other Priority Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Other Priority Claim and the Debtor or (b) such lesser amount as the holder of such Allowed Other Priority Claim and the Debtor might otherwise agree.  Thus, the Plan's treatment of Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Other Priority Claims satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

31.     Acceptance of at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)). Class 2, which consists of a single member (MB Secured Claim), which is not an insider of the Debtor, is impaired and has voted to accept the Plan in the requisite numbers and amounts without the need to include any acceptance of the Plan by any insider. Class 3, which consists of Hermes, is impaired and has voted to accept the Plan in the requisite numbers and amounts without the need to include any acceptance of the Plan by any insider. Class 4, which consists of General Unsecured Claims, is impaired and the holders of Class 4 General Unsecured Claims that are not insiders of the Debtor, have voted to accept the Plan in the requisite numbers and amounts without the need to include any acceptance of the Plan by an insider.  Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

32.    <u>Feasibility (11 U.S.C. § 1129(a)(11)).</u>  The Plan Funder has sufficient funds on hand to fund the Plan in accordance with the Plan.  Those monies will be released from escrow or paid and distributed in accordance with the applicable time frames set forth under the Plan.  The debtor strongly believes that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

33.    <u>Payment of Certain Fees (11 U.S.C. § 1129(a)(12)).</u>  All fees payable on or before the Effective Date under 28 U.S.C. § 1930 and 31 U.S.C. § 3717 either have been paid or will be paid on the Effective Date pursuant to Section 12.6 of the Plan.  Thus, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

34.    <u>Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).</u>  The Debtor does not have any liability to pay "retiree benefits" as that term is defined under section 1114(a) of the Bankruptcy Code.  Accordingly, section 1129(a)(13) of the Bankruptcy Code is not applicable.

35.    <u>Postpetition Domestic Support Obligations and Disposable Income (11 U.S.C. §1129(a)(14 & (15)).</u>  Sections 1129(a)(14) and (15) of the Bankruptcy Code impose certain requirements on individual chapter 11 debtors.  The Debtor is a corporation.  Accordingly, sections 1129(a)(14) and (15) of the Bankruptcy Code are not applicable.

36.    <u>Transfers of Property by Nonprofit Entities (11 U.S.C. § 1129(a)(16).</u>  Section 1129(a)(16) of the Bankruptcy Code imposes certain requirements on corporations or trusts that are not a moneyed, business or commercial corporation or trust.  The Debtor is a moneyed, business or commercial corporation.  Accordingly, section 1129(a)(16) of the Bankruptcy Code is not applicable.

16

37.  <u>No Other Plan (11 U.S.C. § 1129(c))</u>.  No other pending plan of reorganization has been filed with respect to the Debtor.

38.  <u>No Avoidance of Taxes or Avoidance of Application of Securities Act (11 U.S.C. § 1129(d))</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on such grounds.  Accordingly the Plan satisfies the requirements of section 1129(a) of the Bankruptcy Code.

39.  <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based upon the record before the Court, the Plan Proponents solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and they, along with all entities who assisted the solicitation, are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpatory and injunctive provisions set forth in the Plan.


*/s/ Lee Moncho*
Lee Moncho

Sworn to before me this
27th day of January, 2014

*/s/ Jonathan S. Pasternak*
Notary Public, State of New York


17

# EXHIBIT B

January 22, 2014

Nominee of Harry Miller and Sam Spray
c/o Mr. Scott Assouline
Meridian Capital Group LLC
One Battery Park Plaza
New York, New York  10004

Re:     Application # 14-0166
        261 East 78th Street
        New York, New York 10075
        (the "*Property*")

Gentlemen:

We are pleased to inform you that Signature Bank (the "*Bank*") is willing to consider your request to provide permanent financing (the "*Facility*") to be secured by a first fee mortgage on the above captioned real Property on the following terms:

| | |
|---|---|
| Borrower: | A to-be-formed single-purpose entity (the "*Borrower*"), whose managing members will be Harry Miller and Sam Spray (the "*Principals*"); |
| Property Address: | 261 East 78th Street, New York, NY 10075; |
| Property Description: | A rectangular shaped parcel of land located on the north side of East 78th Street midblock between Third Avenue to the west and Second Avenue to the east in the Upper East Side section of Manhattan.  The parcel is improved with a six-story, elevator equipped, 16,900 net rentable square foot office building constructed circa 2008; |
| Loan Amount: | The least of $9,500,000 or 75% of the appraised value of the Property; |
| Holdback: | The Bank will hold back $105,000 from the loan proceeds available to the Borrower at closing and fund this amount into a blocked escrow account at the Bank.  The funds will be released to the Borrower upon lease-up of the fifth floor space in the Property at a minimum annual rental of $210,000.  The terms of the lease, specifically including the tenancy, must be acceptable to the Bank in their sole discretion; |

| Term: | 1. | Initial term – 5 years, |
| | 2. | Extension option – 5 years; |

| Interest Rate: | 1. | For the initial term: | 4.0% fixed for 5 years, |
| | 2. | For the extension term: | A fixed rate for 5 years that is the equivalent of 250 basis points above the then five (5) year U.S Treasury Note as of 30 days prior to the expiration of the initial term with a floor of 4.0%; |

**Payments:** During the initial term – Equal monthly payments of interest and principal sufficient to amortize the loan in 25 years;

During the extension term – Equal monthly payments of interest and principal sufficient to amortize the loan in 20 years;

**Collateral:**

- A first fee mortgage on the Property,
- Collateral assignment of leases and rents;

**Escrows:** Monthly payment of real estate tax escrows will be required;

**Processing Fee:** $2,500 (non-refundable);

**Commitment Fee:** One-half of one percent (0.50%) - $45,000;

**Prepayment Penalties:** Prepayment of the Facility in minimum increments of $25,000 is permitted provided that the Borrower submits a prepayment charge of 5.0% in the first loan year, 4.0% in the second loan year, 3.0% in the third loan year, 2.0% in the fourth loan year and 1.0% in the fifth loan year. Should the extension option be exercised, prepayment is permitted in minimum increments of $25,000 provided that the Borrower submits a prepayment charge of 5.0% in the first option year, 4.0% in the second option year, 3.0% in the third option year, 2.0% in the fourth option year and 1.0% in the fifth option year. The foregoing notwithstanding, there will be no prepayment penalty in the last 60 days of the initial term or the last 60 days of the option term;

**Recourse and Guarantors:** The Principals will be required to provide the standard carve-outs for fraud or intentional misrepresentation, misapplication of proceeds of funds, intentional waste of the Premises or abandonment of the Premises. In addition to the above, the Principals will provide the Bank's standard Environmental Indemnity;

*Signature Bank Terms Sheet*
*261 East 78th Street, New York, NY 10075*

*January 22, 2014*
*Page 3 of 5*

| | |
|---|---|
| Title Insurance: | A title insurance policy must be provided to the Bank. This policy must be acceptable to the Bank and its counsel; |
| Appraisal & Environmental Reports: | Must be ordered by the Bank and acceptable to the Bank and its counsel in all aspects. The Borrower is responsible for all costs. If the Borrower would like to expedite the closing of the loan by having the reports ordered immediately, please remit a check in the amount of $10,000 which will be credited towards the costs of said reports. Otherwise, said reports will be ordered after issuance and acceptance of a loan commitment; |
| Accounts: | The Borrower must maintain all depository accounts at the Bank for the life of the loan; |
| Closing Date: | The closing must occur within 45 days of the issuance of a commitment and must take place at the office of the Bank, time being of the essence; |
| Mortgage Broker: | Any brokerage fees must be paid by the Borrower; |
| Special Conditions: | |

➤ The loan must not be greater than 75% of the appraised value of the Property;

➤ Underwriting pro-forma must support a minimum debt service coverage ratio of 1.3 to 1.0; to be determined in the Bank's sole discretion;

➤ Subject to satisfactory receipt and review of all leases, lease amendments, lease abstracts and tenant estoppels;

➤ Upon receipt of an accepted Term Sheet, the Bank will require a site inspection of the Property and meeting of the principals by an officer designated by the Bank, which inspection will determine, to the Bank's satisfaction, that the Premises are as represented in all submissions from the Borrower;

➤ Borrower responsible for all closing costs;

➤ All payments made via automatic debit from Signature Bank checking account.

| | |
|---|---|
| Good Faith Deposit: | The Borrower must remit a Good Faith Deposit in the amount of $47,500 together with a signed copy of this letter and all other necessary documents. Said Good Faith Deposit will be refunded upon the closing of the subject mortgage loan. If the loan does not close for any reason within |

the control of the borrower, the fee will be deemed to be earned by the Bank as a commitment fee. If the loan does not close for reasons beyond the control of the borrower, the fee will be returned to the borrower, less actual out-of-pocket expenses. Should the Borrower desire expedited processing, it should remit the $10,000 expedited processing deposit together with a signed copy of this letter. In summary, the following fees and deposits are due:

| | |
|---|---|
| Good Faith Deposit | $47,500 |
| Processing Fee (Non-Refundable) | $2,500 |
| Third Party Fees | $10,000 |
| Total | $60,000 |

The above terms and conditions are subject to change, if we do not receive this letter signed by you, together with the Good Faith Deposit and Processing Fee and the information required below within seven (7) days of the date hereof.

All documents required by the Bank for the processing of the subject application must be found to be acceptable to the Bank and its counsel in all aspects in its sole discretion. It is expressly understood between the parties that this letter is not a commitment by the Bank or an agreement to approve the subject loan. If you have any questions, please contact me at (631) 962-7317.

Very truly yours,

Edward B. Docherty
Group Director – Vice President

Agreed to and Accepted by:

**Borrowing Entity:**_____

By: _____ Dated: _____

## Information Required:

- A completed Signature Bank Loan Application (blank copy attached);

- Recent personal financial statements for all owners of beneficial interest, which shall include a statement of liquid assets corroborated by recent bank/brokerage house statements, a detailed real estate schedule, schedule of recurring cash flow and schedule of contingent liabilities;

- A business biography/resume of the Principals;

- Recent income and expense statements for the property;

- Current rent roll;

- Copies of all leases.

# EXHIBIT C

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Erica R. Feynman, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:

261 EAST 78 REALTY CORPORATION,

                                    Debtor.
-------------------------------------------------------------X

Chapter 11
Case No. 11-15624 (REG)

-------------------------------------------------------------

## APPLICATION IN SUPPORT OF ENTRY OF FINAL DECREE

TO:    **THE HONORABLE ROBERT E. GERBER**
       **UNITED STATES BANKRUPTCY JUDGE**

The application of 261 East 78 Realty Corporation ("Debtor"), by its attorneys, DelBello

Donnellan Weingarten Wise & Wiederkehr, LLP, respectfully represents and sets forth as

follows:

1.    On or about December 6, 2011, the Debtor filed a voluntary petition for

reorganization under Chapter 11 of the Bankruptcy Code.

2.    No trustee, examiner or creditors committee has been heretofore appointed in this

proceeding.

3.    By Order dated January 29, 2014 (the "Confirmation Order") this Court confirmed

the Debtor's Second Amended Plan of Reorganization Under Chapter 11 Of the Bankruptcy

Code (the "Plan").

C

4.      §1101(2) of the Bankruptcy Code states as follows:

"substantial consummation means -

(A)     transfer of all or substantially all of the property
        proposed by the plan to be transferred;

(B)     assumption by the debtor or by the successor to the
        debtor under the plan of the business or of the
        management of all or substantially all of the property
        dealt with by the plan; and

(C)     commencement of distribution under the plan."

5.      It is respectfully submitted that substantial consummation of the Plan has now
occurred. On or about March 11, 2014, DDWWW as disbursing agent for the Debtor, pursuant to
the Plan, made complete distribution to allowed holders of Administrative, Class 1, 2, 3 and 4
Claims in accordance with the terms of the Plan.

6.      All other aspects of the Plan have been complied with and satisfied, including but
not limited to the filing of a chapter 11 closing report and payment of all administrative costs
associated with confirmation and consummation of the Plan.

7.      In addition, all quarterly fees pursuant to 28 U.S.C. § 1930 have been substantially
paid in full, and only those fees having accrued on account of disbursements made under the Plan
as of the date of this Application will be paid in full within 10 days of entry of a final decree.

8.      Accordingly, the Debtor respectfully requests that the Court enter a Final Decree
closing the chapter 11 case.

9.      No prior request for relief sought herein has been made to this or any other Court.

WHEREFORE, The Debtor respectfully requests the entry of a final decree closing the

chapter 11 case, together with such other and further relief as is just under the circumstances.


Dated: March14, 2014
        White Plains, New York




                            DELBELLO DONNELLAN WEINGARTEN
                            WISE & WIEDERKEHR, LLP
                            *Proposed Attorneys for Debtor*
                            One North Lexington Avenue
                            White Plains, New York 10601
                            (914) 681-0200
                            JPasternak@DDW-law.com

                            By:    */s/ Jonathan s. Pasternak*
                                    Jonathan S. Pasternak

# EXHIBIT D

## 261 East 78 Lofts LLC
# Transactions by Account
### Lee Monocho Distributions

| Type | Date | Num | Name | Debit | Credit | Balance |
|------|------|-----|------|-------|--------|---------|
| **Lee Monocho** | | | | | | |
| **Monocho Draw** | | | | | | |
| Check | 05/01/2014 | 1029 | Lee Moncho | 10,000.00 | | -10,000.00 |
| Check | 06/16/2014 | wire | Lee Moncho | 5,000.00 | | -15,000.00 |
| Check | 06/30/2014 | 1050 | Lee Moncho | 5,000.00 | | -20,000.00 |
| Check | 08/04/2014 | wire | Lee Moncho | 5,000.00 | | -25,000.00 |
| Check | 09/03/2014 | wire | Lee Moncho | 5,000.00 | | -30,000.00 |
| Check | 10/08/2014 | wire | Lee Moncho | 15,000.00 | | -45,000.00 |
| Check | 11/03/2014 | wire | Lee Moncho | 5,000.00 | | -50,000.00 |
| Check | 11/14/2014 | wire | Lee Moncho | 5,000.00 | | -55,000.00 |
| Check | 12/09/2014 | wire | Lee Moncho | 5,000.00 | | -60,000.00 |
| Check | 12/11/2014 | wire | Lee Moncho | 5,000.00 | | -65,000.00 |
| Check | 01/02/2015 | wire | Lee Moncho | 5,000.00 | | -70,000.00 |
| Check | 01/21/2015 | wire | Lee Moncho | 5,000.00 | | -75,000.00 |
| Check | 02/04/2015 | wire | Lee Moncho | 5,000.00 | | -80,000.00 |
| Deposit | 02/25/2015 | Transfer | Lee Moncho | | 100.00 | -79,900.00 |
| Check | 03/03/2015 | | Lee Moncho | 7,000.00 | | -86,900.00 |
| Check | 03/03/2015 | | Lee Moncho | 4,000.00 | | -90,900.00 |
| Check | 03/05/2015 | | Lee Moncho | 5,000.00 | | -95,900.00 |
| Check | 03/05/2015 | | Lee Moncho | 500.00 | | -96,400.00 |
| Check | 03/05/2015 | Wire | Dean Moncho | 12,000.00 | | -108,400.00 |
| Check | 03/05/2015 | Wire | Harlow & Adams & ... | 10,000.00 | | -118,400.00 |
| Check | 03/06/2015 | | Lee Moncho | 3,000.00 | | -121,400.00 |
| Check | 03/27/2015 | | Lee Moncho | 4,000.00 | | -125,400.00 |
| Check | 03/27/2015 | | Lee Moncho | 12,000.00 | | -137,400.00 |
| Check | 03/30/2015 | | Lee Moncho | 2,000.00 | | -139,400.00 |
| Check | 04/06/2015 | Wire | Dean Moncho | 17,500.00 | | -156,900.00 |
| Check | 04/08/2015 | | Lee Moncho | 3,000.00 | | -159,900.00 |
| Check | 04/22/2015 | | Lee Moncho | 363.13 | | -160,263.13 |
| Check | 05/01/2015 | | Lee Moncho | 4,000.00 | | -164,263.13 |
| Check | 05/08/2015 | | Lee Moncho | 6,000.00 | | -170,263.13 |
| Check | 05/11/2015 | 161 | Joseph Traina | 7,000.00 | | -177,263.13 |
| Check | 05/18/2015 | | Lee Moncho | 5,000.00 | | -182,263.13 |
| Check | 05/18/2015 | | Lee Moncho | 4,000.00 | | -186,263.13 |
| Check | 05/27/2015 | | Lee Moncho | 375.00 | | -186,638.13 |
| Check | 06/02/2015 | | Lee Moncho | 1,973.01 | | -188,611.14 |
| Check | 06/03/2015 | | Lee Moncho | 7,000.00 | | -195,611.14 |
| Check | 06/08/2015 | | Lee Moncho | 12,000.00 | | -207,611.14 |
| Check | 06/08/2015 | | Lee Moncho | 6,000.00 | | -213,611.14 |
| Check | 06/10/2015 | | Lee Moncho | 10,000.00 | | -223,611.14 |
| Check | 06/10/2015 | | Lee Moncho | 3,512.13 | | -227,123.27 |
| Check | 06/23/2015 | 201 | Jonathan Davies | 3,000.00 | | -230,123.27 |
| Check | 06/25/2015 | | Lee Moncho | 35,000.00 | | -265,123.27 |
| Check | 07/01/2015 | 203 | JJL Management LLC | 2,000.00 | | -267,123.27 |
| Check | 07/04/2015 | 204 | Jack Finell | 6,000.00 | | -273,123.27 |
| Check | 07/08/2015 | 205 | Joseph Traina | 6,000.00 | | -279,123.27 |
| Check | 07/09/2015 | Wire | Dean Moncho | 10,000.00 | | -289,123.27 |
| Check | 07/16/2015 | Transfer | Lee Moncho | 4,000.00 | | -293,123.27 |
| Check | 08/04/2015 | Transfer | Lee Moncho | 15,000.00 | | -308,123.27 |
| Check | 08/06/2015 | Transfer | Lee Moncho | 10,000.00 | | -318,123.27 |
| Check | 08/10/2015 | Debit | AJ Madison | 1,637.48 | | -319,760.75 |
| Check | 08/12/2015 | 173 | JJL Management LLC | 3,286.27 | | -323,047.02 |
| Check | 08/17/2015 | Transfer | Lee Moncho | 15,000.00 | | -338,047.02 |
| Deposit | 08/18/2015 | | JJL Management LLC | | 7,050.00 | -330,997.02 |
| Check | 08/24/2015 | Debit | AJ Madison | 366.91 | | -331,363.93 |
| Check | 08/25/2015 | Transfer | Lee Moncho | 7,050.00 | | -338,413.93 |
| Check | 08/27/2015 | 132 | Joseph Traina | 5,000.00 | | -343,413.93 |
| Check | 08/27/2015 | 133 | Jack Finell | 5,000.00 | | -348,413.93 |
| Check | 09/01/2015 | Wire | Dean Moncho | 4,000.00 | | -352,413.93 |
| Check | 09/02/2015 | Transfer | Lee Moncho | 15,000.00 | | -367,413.93 |
| Deposit | 09/03/2015 | Wire | Lee Moncho | | 3,995.00 | -363,418.93 |
| Check | 09/04/2015 | 174 | Harlow & Adams & ... | 4,000.00 | | -367,418.93 |
| Check | 09/09/2015 | Wire | Dean Moncho | 4,000.00 | | -371,418.93 |
| Check | 09/15/2015 | Transfer | Lee Moncho | 16,042.29 | | -387,461.22 |
| Check | 09/23/2015 | Transfer | Lee Moncho | 450.00 | | -387,911.22 |
| Check | 10/01/2015 | 144 | Mario Traina | 5,000.00 | | -392,911.22 |
| Check | 10/02/2015 | Transfer | Lee Moncho | 12,000.00 | | -404,911.22 |
| Check | 10/04/2015 | 143 | Jack Finell | 5,000.00 | | -409,911.22 |
| Check | 10/07/2015 | Transfer | Lee Moncho | 6,000.00 | | -415,911.22 |
| Check | 10/08/2015 | Wire | Dean Moncho | 10,000.00 | | -425,911.22 |
| Check | 10/13/2015 | Transfer | Lee Moncho | 4,015.88 | | -429,927.10 |

## 261 East 78 Lofts LLC
# Transactions by Account
### Lee Monocho Distributions

| Type | Date | Num | Name | Debit | Credit | Balance |
|------|------|-----|------|-------|--------|---------|
| Check | 11/01/2015 | 179 | Joseph Traina | 5,000.00 | | -434,927.10 |
| Check | 11/01/2015 | 177 | John Finnell | 10,000.00 | | -444,927.10 |
| Check | 11/02/2015 | Transfer | Lee Moncho | 13,000.00 | | -457,927.10 |
| Check | 11/10/2015 | Wire | Dean Moncho | 10,000.00 | | -467,927.10 |
| Check | 11/23/2015 | Transfer | Lee Moncho | 300.00 | | -468,227.10 |
| Check | 12/01/2015 | 189 | Harlow & Adams & ... | 5,723.89 | | -473,950.99 |
| Check | 12/01/2015 | 190 | John Finnell | 5,000.00 | | -478,950.99 |
| Check | 12/01/2015 | 159 | Joseph Traina | 5,000.00 | | -483,950.99 |
| Check | 12/01/2015 | Transfer | Lee Moncho | 3,000.00 | | -486,950.99 |
| Check | 12/03/2015 | Transfer | Lee Moncho | 8,000.00 | | -494,950.99 |
| Check | 12/04/2015 | Transfer | Lee Moncho | 7,753.85 | | -502,704.84 |
| Check | 12/08/2015 | Wire | Dean Moncho | 15,000.00 | | -517,704.84 |
| Total Monocho Draw | | | | 528,849.84 | 11,145.00 | -517,704.84 |
| Total Lee Monocho | | | | 528,849.84 | 11,145.00 | -517,704.84 |
| **TOTAL** | | | | **528,849.84** | **11,145.00** | **-517,704.84** |

# EXHIBIT E



**STUDIO GALLOS**
**Design, Architecture & Code Consulting**
54-21 71st Street
Maspeth NY 11378
t.  718.458.1518
f.  718.504.6208
office@studiogallos.com

Sunday, October 9, 2016

# 261 E78 STREET

**NEW YOR, NEW YORK**
BLOCK : 1433   LOT: 21
ZONE(S): **R8B / C1-9**
COMMUNITY DISTRICT: 8

This "Report" describes the potential Build-able Floor Area and compare that to the existing floor area in order to evaluate potential Air Rights. Currently the existing building has a Certificate of Occupancy for a Medical Office Building, Use Group 4.

## ZONING AND PERMISSIBLE USE

The site is located partly located in zones R8B and C1-9. The lot area within the R8B zone is 1,158.27 Sq.Ft. (102.17'x11.34'), the remainder lot area of 1,668.44 Sq.Ft (102.17'x16.33') is located in the C1-9 zone.

**WITHIN R8B ZONE:**
**Use Group 1 :** Use Group 1 consists of single family residences.
A.  Residential uses; single family residences
B.  Accessory Uses.

**Use Group 2 :** Use Group 2 consists of all other types of residences.
A. Residences of all kinds, including apartment hotels and affordable independent residences for seniors.
* Residences shall also include rooming units existing as of March 22, 2016.

**Use Group 3 :** Use Group 3 consists of community facilities that:
1. may appropriately be located in residential areas to serve educational needs or to provide other essential services for the residents; or
2. can perform their activities more effectively in residential environment, unaffected by objectionable influences from adjacent industrial or general service uses; and
3. do not create significant objectionable influences in residential areas.
C.  Community facilities

- Colleges or universities1, including professional schools but excluding business colleges or trade schools
- College or school student dormitories and fraternity or sorority student houses
- Libraries, museums or non-commercial art galleries Long-term care facilities 2,3
- Monasteries, convents or novitiates, without restrictions as to use for living purposes or location in relation to other uses
- Non-profit hospital staff dwellings located on the same zoning lot as the non-profit or voluntary hospital and related facilities or on a separate zoning lot that is immediately contiguous thereto or would be contiguous but for its separation by a street or a street intersection

D.  Accessory Uses

**Use Group 4 :** Use Group 6 consists primarily of community facilities that:
1.  may appropriately be located in #residential# areas to provide recreational, religious, health, and other essential services for the residents; or
2.  can perform their activities more effectively in residential environment, unaffected by objectionable influences from adjacent medium and heavy industrial uses and
3.  do not create significant objectionable influences residential areas.

A.  Community facilities
- Ambulatory diagnostic or treatment health care facilities1, limited to public, private, for-profit or not-for-profit medical, health and mental health care facilities licensed by the State of New York, or a facility in which patients are diagnosed or treated by health care professionals, licensed by the State of New York or by persons under the supervision of such licensee for medical, health or mental health conditions, and where such patients are ambulatory rather than admitted. Such facilities shall not include the practice of veterinary medicine, physical culture or health establishments, or ophthalmic dispensing. In buildings containing residences, such facilities shall be limited to locations below the level of the first #story# ceiling, except that such facilities may be located on a second story provided there is separate access from the outside or directly from a portion of such facility located on the ground floor
- Clubs, except:
    (a)  clubs, the chief activity of which is a service predominantly carried on as a business;
    (b)  non-commercial outdoor swimming pool clubs;
    (c)  any other non-commercial clubs with outdoor swimming pools located less than 500 feet from any lot line; or
    (d)  any activity or use listed within the definitions of either adult physical culture establishments physical culture or health establishments in Section 12-10

**WITHIN C1-9 ZONE:**
**Use Group 1 :** See description above.

**Use Group 2 :** See description above.

**Use Group 3 :** See description above.

**Use Group 4 :** See description above.

**Use Group 5:** Use Group 5 consists of hotels used primarily for transient occupancy.
A.  Transient Accommodations: Hotels, transient
B.  Accessory uses

**Use Group 6:** Use Group 6 consists primarily of retail stores and personal service establishments which:
1.  provide for a wide variety of local consumer needs; and
2.  Have a relatively small service area and are, therefore, widely distributed throughout the City.

Public service establishments serving small areas are also included. Retail and service establishments are listed in two subgroups, both of which are permitted in all C1 Districts. The uses listed in subgroup A are also permitted within a large-scale residential development to provide daily convenience shopping for its residents.

A.  Convenience Retail or Service Establishments
B.  Offices
C.  Retail or Service Establishments
D.  Public Service Establishments
E.  Clubs
F.  Accessory Uses

## SITE
The Site is located in two districts, both of these zones allow Community Facility as of right. The option of Community allows for the higher FAR, 5.1 in the R8B zone and 10.0 in the C1-9 zone. Although residential and commercial are allowed, they are of lower FAR, 4.0 for R8B (residential use) and 2.0 for C1-9 (commercial use).



## FLOOR AREA CALCULATION

The following is the calculation for adjusted maximum floor area ratio for lots within different District Boundries.

| ZONING RESOLUTION: 23-153 / 33-121 / 33-122 / 77-22 | | | |
|---|---|---|---|

| LOT AREA: | 107.22' x 27.67' | | 2,827.04 SqFt. | |
|---|---|---|---|---|

| ZONE | LOT AREA (Sq.Ft.) | % of LOT | FAR | ADJUSTED FAR (% X FAR) |
|---|---|---|---|---|
| R8B | 1,158.27 | 40.97% | 5.10 | 2.09 |
| C1-9 | 1,668.44 | 59.02% | 10.00 | 5.90 |
| | | ADJUSTED MAXIMUM FLOOR AREA = | | 7.99 |

Max Allowed Floor Area ( Lot Area X Adjusted FAR ) = (2,827.04 X 7.99) =            **22,591.58**

## BUILDING SIZE

The following is the floor area breakdown based on provided Construction Documents.



EXISTING FLOORS 1-6 :
2,457.98 Sq.Ft. GROSS AREA

| FLOOR | Existing Gross Floor Area (Sq.Ft.) |
|---|---|
| 1st Floor | 2,453.30 |
| 2nd Floor | 2,453.30 |
| 3rd Floor | 2,453.30 |
| 4th Floor | 2,453.30 |
| 5th Floor | 2,453.30 |
| 6th Floor | 2,453.30 |
| **Total Gross Floor Area** | 14,719.80 |

**ESTIMATED TRANSFERABLE FLOOR AREA**

The following is out best estimate of the available developable floor area available. Based on the Maximum Allowed Floor Area of 22,591.58 Sq.Ft. and an Existing Floor Area of 14,719.80, the Transferable Gross Floor Area is 7,871.78 Sq.Ft.

**PLEASE NOTE:**

All available floor area is based on a Community Facility Use, the use of Residential and/or Commercial Use would not allow for the transfer of floor area.



GENARO R. URUETA, R.A. AIA